# 25-1162

## United States Court of Appeals for the First Circuit

CELACARE TECHNOLOGIES INC., *Plaintiff–Appellant*,

*v.*

CIRCLE INTERNET FINANCIAL LLC, *Defendant–Appellee*.

Appeal From the United States District Court for the District of Massachusetts

## APPELLANT'S REPLY BRIEF

Jason Harrow
  GERSTEIN HARROW LLP
  12100 Wilshire Blvd. Suite 800
  Los Angeles, CA 90025
  (323) 744-5293
  jason@gerstein-harrow.com


  Dated: July 16, 2025

Charles Gerstein
(*counsel of record*)
  GERSTEIN HARROW LLP
  400 7th St. NW, Suite 304
  Washington, DC 20004
  (202) 670-4809
  charlie@gerstein-harrow.com

  *Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES................................................... iii

PRELIMINARY STATEMENT ............................................... 1

ARGUMENT ................................................................................ 2

I. CELACARE STATES A CLAIM UNDER UCC 8-405 .................. 2

    A. The Coins Were "Lost" Or "Destroyed"................................. 2

        1. Circle denies well-pleaded facts ............................... 2

        2. Circle misunderstands what makes a certificate "lost" or "destroyed."............................. 3

        3. Circle's argument that USDC can never be lost or destroyed leads to absurd results. ............... 7

    B. USDC Represent "Obligations" of Circle ............................. 8

        1. USDC represent an obligation to "back" coins ........ 8

        2. The terms read as a whole create an obligation to pay ....................................................... 9

        3. Celacare made both arguments below ................... 13

    C. USDC Are Traded on Coinbase, Which Is A "Securities Exchange"............................................................................ 14

    D. Circle Abandoned Its Meritless Arguments That USDC Are Not Divisible................................................................ 16

    E. USDC Are Certificated ........................................................ 16

      1.    Delaware law does not require that a certificate be on paper ............................................. 17

      2.    The UCC instructs courts to consider commercial practice, which treats USDC as certificates ................................................................ 18

      3.    USDC are state-law securities subject to regulation .............................................................. 19

F.    Circle Ignores The Pleading Standard in Faulting Celacare For Not *Already* Posting a Bond and Not *Already* Registering for a Mint Account ............................... 20

G.    The Court Should Reject Circle's Attempt to Re-Write The Law To Exclude Crypto Companies ............................... 23

II.    CELACARE STATES AN EQUITY CLAIM .................................. 24

A.    Celacare States a Claim Under Massachusetts or, Alternatively, Delaware Law ................................................. 25

B.    Circle's Contract Does Not Entitle it to Keep Money for Nothing ................................................................................... 26

C.    If Circle's Reading is Right, Its Promise Is Illusory ............. 27

D.    The District Court Wrongly Dismissed the Case With Prejudice ................................................................................. 28

CONCLUSION ....................................................................................... 30

CERTIFICATE OF COMPLIANCE ....................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461 (Del. Ch. 2022) .................................................................. 12

*Ballou v. General Electric Co.*, 393 F.2d 398 (1968) ............................. 30

*Chumash Cap. Invs., LLC v. Grand Mesa Partners, LLC*, 2024 WL 1554184 (Del. Super. Ct. April 10, 2024) ...................... 26

*Epstein v. C.R. Bard, Inc.*, 460 F.3d 183 (1st Cir. 2006) ........................ 29

*Fire & Police Pension Association of Colorado v. Abiomed, Incorporated*, 778 F.3d 228 (1st Cir. 2015) ................................... 30

*Fisher v. Kadant, Incorporated*, 589 F.3d 505 (1st Cir. 2009) ................................................................................ 29

*Fitzgerald v. Codex Corp.*, 882 F.2d 586 (1st Cir. 1989) ........................ 14

*Germaninvestments AG v. Allomet Corporation*, 225 A.3d 316 (Del. 2020) ................................................................. 5

*Highland Cap. Mgmt. LP v. Schneider*, 8 N.Y. 3d 406 (2007) ..................................................................................... 18

*Invest Almaz v. Temple–Inland Forest Prods. Corp.*, 243 F.3d 57 (1st Cir. 2001) ................................................... 29

*Morgan v. Town of Lexington, MA*, 823 F.3d 737 (1st Cir. 2016) ..................................................................................... 29

*Nystedt v. Nigro*, 700 F.3d 25 (1st Cir. 2012) .......................................... 3

*Petroleos de Venezuela, S.A. v. PDV Holding Incorporated*, 306 A.3d 572 (Del. Ch. 2023) ....................................... 5, 22

*Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5 (1st Cir. 2004) ................ 29

*Sec. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d
260 (S.D.N.Y. 2024)............................................................... 15, 16

*U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720 (1st Cir. 2007) ................. 29

### Statutes

15 U.S.C. § 78c(A)(10) ........................................................................ 9

6 Del. Code § 1-201 ........................................................................... 17

6 Del. Code § 1-301 ........................................................................... 19

6 Del. Code § 8-102 ................................................................. 8, 14, 17

6 Del. Code § 8-405 ........................................................................... 20

8 Del. Code § 168 .............................................................................. 22

### Other Authorities

SEC, *Statement on Stablecoins* ........................................................ 9

UCC § 8-103, Comment 1 ................................................................. 18

UCC Art. 12, Rfs. & Ann, Off. Cmt. .............................................. 19

### Treatises

Charles Alan Wright, et al., *Motions to Dismiss—Practice
Under Rule 12(b)(6)*, *in* 5b FEDERAL PRACTICE AND
PROCEDURE § 1357 (4th ed. 2024).................................................. 29

### Constitutional Provisions

U.S. CONST., Art. I, Sec. 8, cl. 5....................................................... 9

# PRELIMINARY STATEMENT

Defendant-Appellee Circle Internet Financial LLC issues billions of coins (called US Dollar Coins, or USDC) to the public, promises to "back" each with a dollar, and promises to "redeem" each for a dollar. Plaintiff-Appellant Celacare Technologies accidentally destroyed one million coins and asked Circle to reissue new ones, as required by Delaware law for certificated securities like USDC. Circle refused, arguing that its blockchain-traded asset is fundamentally different than every economically identical asset before it, and the district court incorrectly sanctioned this refusal.

On appeal, Circle argues that the coins are not actually "lost" or "destroyed," even though the complaint plausibly (indeed unassailably) alleges that they will never be recovered. Circle further insists that it need not replace the coins because they are not "obligations" at all, even while conceding that they encode a legal requirement for Circle to "back" each coin with a dollar; because the coins are electronic and not pieces of paper; and because the exchanges on which they trade—which call themselves, and have been held by federal courts to be, "securities exchanges"—are not "securities exchanges."

Circle is wrong on all counts. Indeed, adopting Circle's arguments would undo decades of established practice and lead to a deeply unfair result that the UCC exists to prevent. After all, Circle admits on appeal that lost coins are "all too common," Circle Br. 3, and that it will keep Celacare's dollars and the dollars backing all of those other lost coins forever, *id.* 30. But using a blockchain does not exempt Circle from the UCC or equity. This Court should reverse.

## ARGUMENT

## I.   CELACARE STATES A CLAIM UNDER UCC 8-405

To state a claim for reissuance under Section 8-405 of the Delaware UCC, Celacare must plead that its coins have been "lost or destroyed" and that (a) USDC are securities, (b) USDC are certificated securities, (c) Celacare will post an adequate bond, and (d) Celacare will comply with reasonable conditions on reissuance. *See* Opening Br. 25. It has done so.

### A.   The Coins Were "Lost" Or "Destroyed"

#### 1.   *Circle denies well-pleaded facts*

Celacare's complaint explains in detail how the blockchain works, App. 7–10, and that explanation shows that coins sent to a mistyped wallet address are "permanently inaccessible, can never be moved or redeemed, and so have been destroyed," App. 14. These facts are well

pleaded and must be accepted, *Nystedt v. Nigro*, 700 F.3d 25, 30 (1st Cir. 2012), and they meet the requirement that Celacare's coins were "lost or destroyed."

Circle's counterargument (at 48) refuses to accept the facts. For instance, Circle contends that Celacare "transferred the USDC *to an unnamed third party*." (emphasis added). That is not what the Complaint says and not what happened. *See* App. 14. Unsurprisingly, Circle offers no argument in support of the false conclusion that any other person or entity has access to the coins. Taking the pleaded facts as true, the coins are destroyed, not in someone else's possession.

### 2. *Circle misunderstands what makes a certificate "lost" or "destroyed."*

In addition to resisting the well-pleaded facts, Circle also makes several meritless arguments that USDC coins that are inaccessible to any user, forever, have not been lost or destroyed. Circle contends (at 30) that the coins are not "destroyed" because they are neither "damaged" nor "unusable." As support for the coins' supposed "usability," Circle (a) points to its *own* ability to freeze the coins, which Celacare alleged in the Complaint, *id.* (citing App. 14–15), and (b) claims that Celacare somehow requested that the destroyed coins be sent back to Celacare, *id.* (citing

App. 14–15). But *the issuer*'s ability to "freeze" already-unusable coins and reissue new ones says nothing about *a user*'s ability to use them as intended. And Celacare simply never asked for its coins back—that, as Celacare pleaded, is impossible. App. 14 ("*No one* will *ever* be able to access the funds in the erroneous wallet address.") (cited in Circle Br. 30).

Indeed, as amici noted, Circle itself has touted to Congress that one benefit of USDC is that "[t]he technology of smart contracts allows for the freezing of assets without delay on public blockchains." AFR Amicus Br. 4. But nowhere does Circle argue that its unique ability as the issuer to freeze the coins and reissue them means that somehow the coins are recoverable and usable by Celacare or anyone else. According to the plausible allegations in the Complaint, they are not.

Next, Circle contends (at 31) that "to be 'lost' or 'destroyed,' it is not enough that [something be] inaccessible *to Celacare*." (emphasis added). That is correct but irrelevant, because Celacare pleads that the coins are inaccessible to Celacare *and anyone else*. If Celacare had accidentally sent the coins to someone else, giving some other party possession of the coins, Celacare would lose this case. That is the holding of *Germaninvestments AG v. Allomet Corporation*, on which Circle relies (at

31), in which the Delaware Supreme Court held that an analogous provision of Delaware corporate law requiring replacement of stock certificates is not the appropriate means of addressing an "ownership dispute." 225 A.3d 316, 339 (Del. 2020).

But where, as here, the coins are not accessible *to anyone*, they are "lost" or "destroyed." That is the holding of *Petroleos de Venezuela, S.A. v. PDV Holding Incorporated*, in which the Chancery Court held that *even if* stock certificates were "in the possession of the Maduro regime," the replacement provisions applied. 306 A.3d 572, 583 (Del. Ch. 2023). Circle contends (at 31) that this case does not apply because there no one knew for sure where the certificates were. But the court made clear that the plaintiffs would win if the certificates were shown to be in Maduro's desk drawers. 306 A.3d at 583. And no one conceded that the certificates had been "lost" or "destroyed," as Circle contends (at 31) only that, as Circle concedes here, the certificates were *inaccessible* to the plaintiff and not owned by anyone else: "[Plaintiff] alleges, and [Defendant] does not dispute, that [Plaintiff] *lacks access* to its offices in Venezuela due to the ongoing political turmoil in that country. Thus, the court *finds* that [Plaintiff] has satisfied its burden to show that the original stock

certificate . . . has been lost, stolen, or destroyed." *Petroleos*, 306 A.3d at 583 (emphases added).

This makes sense because, contrary to Circle's argument, the Delaware UCC is not concerned with abstract questions of whether a security certificate "exists" but rather with whether anyone with an ownership claim to that certificate can ever use it. Circle thus misses the point when it characterizes Celacare's argument as contending "that a letter becomes 'lost' or 'destroyed' simply because the person who wrote the letter slipped it into the slot of the wrong locked mailbox." Circle Br. at 31. If the locked mailbox was known to belong to the neighbor of the intended recipient, then yes, the letter would not be "lost or destroyed."

But that is not what Celacare has alleged here. Rather, continuing the analogy, Celacare has alleged that the letter was accidentally placed into a mailbox that can never be accessed by anyone, because it is secured by an unbreakable lock, made out of an impenetrable material, and was dropped to the bottom of the Mariana Trench. In that case, then yes, the letter in the wrong mailbox would be "destroyed"—unusable, permanently irretrievable, never to be recovered—and Celacare should win. Circle's reading is the anomalous one, because it would permit the

party capable of replacement to point to the impenetrable mailbox at the bottom of the ocean and say "see, it's right there!"; indeed it would allow the issuer of a paper certificate that is put through a shredder to do the same. That makes no sense, and it is not the law.

3. *Circle's argument that USDC can never be lost or destroyed leads to absurd results.*

Circle's position is that its coins can *never* be lost or destroyed and so it gets to keep the money backing those coins *no matter what*: "Even assuming that the USDC is 'permanently inaccessible and will never be redeemed,'" Circle writes (at 47), "it nonetheless 'remains in circulation.'" (cleaned up). And because the coins "remain in circulation," in Circle's view—which every USDC does even if "permanently inaccessible"—Circle will keep the corresponding funds. *Id.*

This is remarkable. Although Circle commits in its terms to keep the money backing USDC segregated from the rest of Circle's money, it may use the interest as it pleases. Assuming today's prime interest rate continues, Circle will earn approximately $1.1 million in the next ten years from Celacare's lost $1 million; $3.5 million in the next 20 years; and $1.7 *billion* in the next hundred years. *See* INVESTOR.GOV, *Compound Interest Calculator* (assuming 7.5% rate).

7

Even more remarkable: Circle admits (at 3) that cases like this one are "all too common," so that calculation is just the tip of the iceberg of Circle's profit from its customers' mistakes. If this is not "unjust enrichment," it is hard to imagine what would be. *See also infra* Section III. Thankfully, Circle does not exist in its own law-free zone.

## B. USDC Represent "Obligations" of Circle

As Celacare explained, to be a "security" a "financial" asset must represent an "obligation of an issuer." 6 Del. Code § 8-102(a)(15). Circle's USDC terms promise that Circle will "back" each coin, which resolves this issue. Further, the terms indeed promise to pay the holders of coins. USDC are "obligations."

### 1. *USDC represent an obligation to "back" coins*

Celacare explained in its opening brief (at 28) that "the promise to back each token 1-to-1 is an obligation, so this prong of the definition is met." In response, Circle admits (at 45) that "[t]he USDC terms *promise* that Circle will 'fully back' USDC with an 'equivalent amount of U.S. dollar-denominated assets'" (emphasis added), and that USDC are "a *commitment* from Circle to hold in reserves one dollar . . . for every USDC issued by Circle," *id.* 5 (emphasis added). Circle does not, and cannot,

contend that "promis[es]" and "commitment[s]" are not "obligations." So Circle loses.

To avoid that conclusion, Circle contends (at 21) that its obligations to back its coins "makes USDC more akin to currency" and, under federal law, "currency is not a security." But the question is not whether USDC are investment securities under federal law, which are the only sources Circle cites on this point. Circle Br. 21 (citing 15 U.S.C. § 78c(A)(10) and SEC, *Statement on Stablecoins*). The question is whether USDC represent an "obligation" under the UCC, which they do. And Circle's contention that USDC are *money* is unsupported and unsupportable: The power to "coin money" belongs to Congress, not Circle. U.S. CONST., Art. I, Sec. 8, cl. 5.

### 2. *The terms read as a whole create an obligation to pay*

That USDC are "obligations" to "back" the coins with dollars is alone sufficient to resolve this issue. But USDC are additionally promises to pay: Their terms require Circle to "back[] [USDC with dollars] . . . *for the benefit of*[] users." App. 25 (emphasis added). "Circle commits to redeem 1 USDC for 1 USD." *Id.* And Circle's terms explain users' "right to redeem" *five* times. App. 24–42. Indeed, the whole premise of an asset-

backed "stablecoin" such as USDC is that users can convert the coins to dollars with the issuer.

In response, Circle contends (at 19–20) that two paragraphs of its terms permit it to *fully* dishonor *every* user's "right to redeem" each USDC for a dollar. The first applicable provision reads in relevant part:

> We reserve the right to . . . decline to process any . . . redemption without prior notice and may limit or suspend your use of one or more USDC Services at any time, in our sole discretion. Our rights under this paragraph are subject to our obligations under applicable law and licenses, including but not limited to our reasonable suspicion of inappropriate or illegal conduct. . . . We may, in our sole discretion, delay issuances or redemptions if we reasonably believe the transaction is suspicious, may involve fraud or misconduct, violates applicable laws, or violates the terms of these Terms.

App. 30.

This paragraph cannot bear the weight Circle puts on it. For starters, it says that Circle's "rights" to "decline to process any . . . redemption" are "subject to . . . our reasonable suspicion of inappropriate or illegal conduct," not in their unfettered discretion. And, in context, the paragraph addresses circumstances in which Circle has a reason—indeed

a reason "under applicable law and licenses"—to deny redemption, such as "fraud or misconduct" or "violat[ion] of applicable laws" or "terms."

The second paragraph is even farther afield. It reads, in full:

> Circle may determine not to make USDC or the USDC Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location. We may also, without liability to you or any third party, refuse to let you register for a Circle Mint account.

App. 26. Circle's "commit[ment] to redeem 1 USDC for 1 USD" is elsewhere conditioned on "register[ing] for a Circle Mint account." App. 25. But neither paragraph in fact allows Circle to deny registration in its "sole discretion," as Circle wrongly argues. Br. 19. Instead, the terms allow Circle to decline to service a whole market in its "sole discretion" and "also" to "refuse to let you register for a Circle mint account" generally. And, elsewhere in the contract, Circle lists *twenty-six* specific things USDC users are forbidden to do, like "defame" Circle or display obscene images. App. 31 ¶¶ 10–11. If Circle could simply keep everyone's money for any reason it wants, all those prohibitions would be surplus.

Read together with Circle's "commit[ment] to redeem 1 USDC for 1 USD," the best reading of Circle's contract is that it (a) requires Circle to

back all circulating coins with equivalent dollars, (b) requires Circle to redeem each coin for a dollar conditional on a user registering for a Circle Mint account, and (c) allows Circle reasonably to deny either redemption or registration where the party seeking to redeem violates its terms or applicable laws. Delaware courts interpreting "sole discretion" clauses unsurprisingly hold that they do not generally "give [parties] the authority to ignore a mandatory provision of the . . . Agreement." *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 478 (Del. Ch. 2022). That is because such a reading would create an obvious "contradiction" with the rest of the contract, *id.*, and because it would necessarily violate the implied covenant of good faith and fair dealing by "preventing the other party to the contract from receiving the fruits of the bargain," *id.* at 479 (collecting cases).

Circle also ignores its relationship to its customers. How are USDC supposed to maintain a value of one dollar if Circle can refuse to redeem every single outstanding coin for any reason, and what point would the one-to-one backing serve in that event? The question here is not whether Circle could, if it wanted to, find some reason to decline to redeem

*Celacare's* lost coins, but rather whether the terms create *any* "obligation" for Circle to redeem coins.

Circle's extraordinary reading of its terms turns USDC into no more than collectibles and renders the terms of the contract between USDC and users worthless: Circle in fact never has to pay anyone, ever. Indeed, on Circle's reading—necessary for it to prevail here, because again it must show that it has *no* obligations under the terms—it would be free to deny redemption to anyone who politically opposes Circle's proposed regulatory treatment of USDC. The fact that USDC consistently trades for a dollar means that none of its users read its contract to give it the unfettered discretion to deny redemption it claims here.

### 3. *Celacare made both arguments below*

Finally here, Circle contends that Celacare "forfeited" its contention that USDC represent an "obligation" because they require Circle to "back" coins by failing to "argue this theory below." Circle Br. 21 (citing Dkt. No. 17 at 8–9). Not so. In the cited passage, Celacare wrote:

> Circle argues that USDC are not securities certificates because "Circle never promised . . . that . . . USDC would be *redeemed*," only that that "Circle must *back* the USDC tokens" with adequate cash reserves. But Section 8-102(a)(15) requires only that something be an "obligation" to

> be a security, not that it be an obligation free from any conditions, so Circle's reading fails immediately: USDC create financial obligations for Circle.

D. Ct. Dkt. No. 17 at 8–9 (cited at Celacare Br. 21). That is the argument here. Circle also complains (at 21) that Celacare did not "plead this supposed obligation in the Complaint," but Celacare attached the full terms of service and noted that they govern Circle's obligations, which is sufficient. *E.g.*, *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989). At the time the Complaint was filed, Celacare frankly could not have imagined that Circle would fully disclaim its obligation ever to redeem coins. This Court must consider these arguments.

## C. USDC Are Traded on Coinbase, Which Is A "Securities Exchange"

Next, to be a "security," a "financial asset" representing an "obligation of an issuer" must also be, or be of a type, "dealt in or traded on securities exchanges or securities markets" *or* be a "medium for investment." 6 Del. Code § 8-102(a)(15). If Celacare can show that USDC are "traded on securities exchanges or securities markets," Celacare meets this test. As Celacare explained, this requirement is easily met because USDC trades on Coinbase, which (a) is concededly a "securities intermediary" under the UCC, (b) calls itself an "exchange" and is one

14

under the well pleaded facts, and (c) a federal court has held to be "operat[ing] as a national securities exchange." *Sec. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 279 (S.D.N.Y. 2024); *see* Opening Br. 29–31. In response, Circle ignores the facts, conflates federal and state law, and ignores federal law too.

Circle helpfully concedes (at 22), as it must, that Coinbase is a "securities intermediary" and that all assets traded on its platform are "financial assets" governed by Article 8 of the UCC. But Circle then argues (at 23) that the allegations that Coinbase is a securities "exchange" (as opposed to an "intermediary") are only "conclusory." But Celacare pleaded that "Coinbase . . . [is] a business through which users can buy, hold, and trade crypto assets." App. 12. That is what an exchange is: a place to buy, hold, and trade. Celacare pleaded, then, that Coinbase is a "securities intermediary" on which users *exchange securities* and is therefore a "securities exchange." These allegations are not conclusory; they are conclusive.

Circle's digression about whether stablecoins like USDC are "securities" or exchanges like Coinbase are "securities exchanges" *for purposes of federal securities law*, *see* Circle Br. 24, *contra Coinbase*, 726

F. Supp. 3d at 307, is irrelevant because that is not the question here. Article 8 requires that a security be traded on a "securities exchange" *or* be a "medium for investment"; a security need not be both. Because USDC is traded on Coinbase, and Coinbase is a "securities exchange" under the UCC—and, for good measure, federal law, *id.*, which Circle ignores (at 23)—this requirement is met.

### D. Circle Abandoned Its Meritless Arguments That USDC Are Not Divisible

In district court, Circle argued that USDC fail the divisibility test. D. Ct. Dkt. No. 21 at 6. It abandons this argument on appeal. *See also* Celacare Br. 31.

### E. USDC Are Certificated

Next, USDC are "certificated" securities, as necessary to meet the definition of "security" and to meet the identical definition of "certificated" for purposes of Section 8-405. *See* Opening Br. 33–40. USDC are documents of Circle's obligations that can be possessed. Circle urges this Court to create a novel requirement that certificates be pieces of paper, asks this Court to ignore commercial reality in contravention of the UCC's explicit instruction to consider it, and asks for a crypto-only

loophole that the law does not allow. Circle Br. 25–29. These arguments are incorrect.

### 1. *Delaware law does not require that a certificate be on paper*

Circle contends (at 25) that a "certificate" under Delaware law must be made out of paper. But the law doesn't say that. And context makes clear that the law doesn't mean that: The UCC contains a specific definition for "writing," which "includes printing, typewriting, or any other intentional reduction to tangible form," 6 Del. Code § 1-201(b)(43), and it does *not* use the term "writing" when defining "certificate," even though it does use it in other nearby definitions, *e.g.*, *id.* § 8-102(a)(6)(i). This means a "certificate" need not be a "writing," but rather includes anything that, like USDC, documents a certification. The plain text controls.

Circle resists this conclusion by citing UCC commentary and caselaw *referring to* securities certificates as pieces of paper. Circle Br. 27 ("The term 'security certificate' refers to the paper certificates that have *traditionally* been used to embody the underlying intangible interest." (emphasis added).) But none of Circle's cases or examples addressed the question whether a possessable electronic record can also

count. And Article 8's definitions were "deliberately worded by the drafters 'in general terms, because they must be sufficiently comprehensive and flexible to cover the wide variety of investment products that now exist *or may develop*.'" *Highland Cap. Mgmt. LP v. Schneider*, 8 N.Y. 3d 406, 413 (2007) (quoting UCC § 8-103, Comment 1) (emphasis added). That most securities certificates have indeed been paper in the past proves nothing.

Circle also calls Celacare's plain-text reading "strained" (at 27) but Circle cannot account for why the UCC defines "writing" but does not apply that definition to "certificate" or "certificated." The plain text of the law is clear, and Celacare's reading of it is the only natural one: A "certificate" need not be paper, but rather anything that "documents" a certification, which Circle concedes USDC does.

2. *The UCC instructs courts to consider commercial practice, which treats USDC as certificates*

Unable to defeat Celacare on the text, Circle contends (at 25) that "established commercial understanding of a certificate is that the certificate must be paper." Celacare agrees that this Court should consider the commercial reality in which USDC are traded, as instructed by Section 1-301 of the UCC and the "practical, functional approach" of

Article 8, *Highland Cap. Mgmt.*, 866 N.E.2d at 1023. Commercial reality *does* treat USDC as certificates. As Celacare explained (at 38–39), the market treats USDC as things that can be possessed, lost, or destroyed. The most persuasive evidence of this is Circle's own terms, which provide that "your ability to redeem 1 USD with us for each USDC is conditional on your possession of a corresponding amount of USDC." App. 26.

Circle's response to its own language is circular. It contends (at 28 n.5) that "the reference to 'possession' in the USDC Terms means *control of the USDC* via cryptographic keys, not custody of any physical certificate." (emphasis added). That is necessarily true, because there is no "physical certificate," but irrelevant. In fact, "control of the USDC" is, as Celacare explained (at 17) regarded by the UCC as the "functional analogue of possession of tangible personal property such as goods." UCC Art. 12, Rfs. & Ann, Off. Cmt. That ends the matter.

3.  *USDC are state-law securities subject to regulation*

Finally, Circle contends (at 28) that because, in its view, USDC are neither certificated nor uncertificated, they are not subject to any regulation under Article 8. This cannot be. The choices under the UCC are that an instrument like USDC is (a) certificated (in bearer or

registered form), (b) uncertificated, or (c) not a security. As demonstrated above, USDC *are* state-law securities in every other respect, so permitting the conclusion that they nonetheless cannot be regulated because they are traded digitally would allow companies like Circle to do what no other company can: sell billions of dollars of securities to the public without state regulation, or even federal regulation, *see* Circle Br. 24; *see also* AFR Amicus Br. 8–15 (describing pattern where crypto companies claim that their products "require[] bespoke regulatory arrangements" and so are outside of all existing regulation). Thankfully, that is not the law.

### F. Circle Ignores The Pleading Standard in Faulting Celacare For Not *Already* Posting a Bond and Not *Already* Registering for a Mint Account

Having established that USDC are certificated securities and that they are lost or stolen, Celacare must next plead that it will "file with the issuer a sufficient indemnity bond" and "satisf[y] other reasonable requirements imposed by the issuer." 6 Del. Code § 8-405(a). Celacare pleaded that Circle is "required under Section 8-405(a) of the UCC to reissue the USDC to Celacare *contingent on* Celacare posting an *appropriate* indemnity bond." App. 19 (emphasis added). Celacare also

"offered to provide reasonable assurance to Circle that it would not suffer liability from the lost USDC." *Id.* And Circle indeed asked for nothing else in its pre-suit correspondence despite Celacare inviting it to propose reasonable conditions. App. 44, 77–78. That states a claim. Opening Br. 45–47.

Circle's argument (at 33–39) that the Complaint does not state a claim because Celacare has not *already* posted a bond or registered for Circle Mint ignores the pleading standard by requiring Celacare to prove its case before trial—Celacare pleaded the required elements and is entitled to the benefit of all reasonable inferences from the pleaded facts, at least one of which is that Celacare would, if required, post an adequate bond. Indeed, one purpose of litigation is to determine the amount of a bond. Just as a court conducts a preliminary-injunction hearing *before* requiring the applicant to post the security required in case the defendant is "found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), so too is the bond here necessary for ultimate recovery, not a prerequisite to having the claim survive a motion to dismiss. As the case progresses on remand, a nominal bond would be appropriate here, just as in *Petroleos*, 306 A.3d at 594, which was decided under a provision

of Delaware law with materially identical bond language, *see* 8 Del. Code § 168 (requiring that "the plaintiff give the corporation a bond in such form and with such security as to the court appears sufficient"). But for now Celacare prevails by plausible pleading alone.

Circle's related claim that Celacare must plead that it has a Mint account to survive a motion to dismiss is wrong. Celacare asked Circle to propose reasonable terms for reissuance (App. 44) and Circle did not say "you must open a Circle Mint account." Instead, Circle claims that because someone must open a Circle Mint account to *buy* USDC from it, Celacare should have known that it must do so before filing this suit. Unsurprisingly Circle cites no authority for that requirement.

Finally on this point, should the Court agree with Celacare that reissuance is otherwise required under Delaware law but that Celacare must register for a Circle Mint account or post a bond to state a claim, the remedy would be to permit amendment on remand to allow Celacare to satisfy those requirements, not dismiss with prejudice. *See infra* § II.D.

### G. The Court Should Reject Circle's Attempt to Re-Write The Law To Exclude Crypto Companies

Finally on this claim, Circle contends (at 40) that "rejecting Celacare's claim" and putting all risk of loss on the USDC holder "makes good sense" because the UCC should "guide commercial behavior" by "allocating responsibility to the party best able to prevent the loss by the exercise of care." But Circle's argument writes out Section 8-405 entirely. Its theory would *never* permit reissuance for a lost or destroyed certificate because the holder is *always* the party supposedly "best able to prevent the loss." Circle's cited cases concern other UCC provisions, Circle Br. 40, and so its attempt to play armchair law-and-economics professor by guessing who the least-cost avoider is fails in the face of the alternative policy choice by the Delaware Legislature and the UCC drafters.

But, for what it's worth, Circle's law-and-economics argument is not persuasive. As Celacare explained (at 20), permitting reissuance of lost or destroyed securities certificates makes sense because otherwise holders would need to take wastefully excessive precautions merely to show they own instruments where ownership is not contested, and where it is trivial for the issuer to reissue the corresponding certificate. That's

true here: Circle does not dispute that it can freeze the destroyed coins and issue new ones without cost. *See* AFR Amicus Br. 4–5. On the other hand, Circle would have all its users buy insurance to avoid the cost Circle *creates* when they accidentally destroy coins, which Circle admits is "all too common." Circle Br. 3. Delaware law and the UCC, which require reissuance to replace "lost or destroyed" certificates, make sense here. Circle's position doesn't.

## II. CELACARE STATES AN EQUITY CLAIM

In the alternative to its claim under Section 8-405, Celacare pleaded a claim for "money had and received." The district court dismissed that claim with prejudice because it incorrectly concluded that Celacare had alleged that Delaware law applied to that claim, even though it did not, and the district court made no choice-of-law analysis of its own. In fact, Celacare pleaded that Delaware law governs the *contract* between Celacare and Circle, and thus Delaware law would be needed to *overcome* the *general* equity rule requiring Circle to return Celacare's money. App. 20–21. Circle concedes that all potentially applicable common-law claims require it to return money if Celacare shows that

Circle is unjustly in possession of money and that no contract bars the claim. That is what happened here.

### A. Celacare States a Claim Under Massachusetts or, Alternatively, Delaware Law

As Celacare explained (at 54), to state a claim for unjust enrichment under either Delaware or Massachusetts law, Celacare must plead that Circle was unjustly enriched at Celacare's expense. That is what the Complaint pleads: because the coins have been destroyed, Circle will never need to redeem the one million dollars and can pocket the money or collect interest indefinitely. Opening Br. 55–56. In response, Circle argues (at 46) that it was not enriched because the million USDC "remains in circulation." This defies the pleaded facts, *see supra* I.A, but it is also a non sequitur. The question is not whether the coins still exist, but whether Circle has been "discharged" of its "obligation" to back and redeem the coins. Taking the allegations as true, it has.

Circle next contends (at 47) that there is an insufficient relationship between its enrichment and Celacare's impoverishment because Circle did not destroy the coins and Celacare bought them from someone else. But Circle sold the coins in the first instance *and has the million dollars*. Because Circle is the party that has been enriched, the Complaint states

a claim against it. *E.g.*, *Chumash Cap. Invs., LLC v. Grand Mesa Partners, LLC*, 2024 WL 1554184, at *16 (Del. Super. Ct. April 10, 2024) (allowing unjust enrichment claim against the seller of a fraudulent arrangement).

### B. Circle's Contract Does Not Entitle it to Keep Money for Nothing

Circle next contends that even if its enrichment would otherwise be unjust, its terms of service permit it to keep customer money forever, in exchange for (as explained below) nothing, because Circle warned users that destroyed tokens cannot be recovered. Circle Br. 44–45. Circle's contract language cannot bear the weight Circle needs. Circle's terms indeed state Circle's view that losses *of coins* associated with sending those coins *to the wrong person* are the user's problem, *id.*, but the terms do not say (although they easily could) that no matter what happens anywhere, ever, for any reason, Circle will *always* keep the *money* "back[ing]" the coins. Regardless, Circle reads its contract as permitting it to keep customer money even when customers present USDC for redemption. Circle Br. 19–20. If Circle's contract truly disallows redemption for any reason or no reason, any other language purporting

to shift the risk of loss to customers is pure surplusage: Circle can effect a loss of dollars all on its own. That cannot be right.

## C. If Circle's Reading is Right, Its Promise Is Illusory

Next, as Celacare explained (at 58), if Circle has disavowed its promise to repay USDC holders, and even to back those coins with real dollars in segregated accounts, that would make the contract illusory, and so permit a claim of unjust enrichment to go forward. Circle concedes that if its promises are illusory then Celacare's unjust enrichment claim would not be barred by the contract, but contends (at 45) that "the USDC Terms promise that Circle will 'fully back[]' USDC with an 'equivalent amount of U.S. Dollar-denominated assets,'" which therefore renders the contract non illusory.

This fails for two reasons. First, Circle cannot have it both ways: either its contract creates "obligations" for purposes of Article 8 or it does not. Circle argued that its terms gave it *no* obligations, so it cannot be heard here to argue that indeed the terms do give it not only obligations but meaningful ones.

Second, a promise to "back" convertible coins with dollars *that will never be paid* is illusory. What good does it do anyone for a company to

keep customer money that it will never pay? Circle's reading does not make sense in any reasonable commercial context, and indeed that is probably why, when the price of USDC precipitously dropped, Circle assured the market that USDC would "remain redeemable": The prospect of redemption is the only value Circle has ever provided to anyone. *See* Opening Br. 11–12. That it now disavows that promise and argues that it may keep all its customers' funds forever, for any reason, defeats any reliance on its contract to preclude other claims.

### D. The District Court Wrongly Dismissed the Case With Prejudice

Finally on this point, if this Court finds that the facts state a claim for unjust enrichment but the claim was improperly captioned or there is another technical defect, Celacare must be given a chance to amend on remand. This Circuit's law is clear that "dismissal under Rule 12(b)(6) generally is not with prejudice" because "the federal policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading." Charles Alan Wright, et al., *Motions to Dismiss—Practice Under Rule 12(b)(6)*, *in* 5b FEDERAL PRACTICE AND

PROCEDURE § 1357 (4th ed. 2024) (citing, among others, *Morgan v. Town of Lexington, MA*, 823 F.3d 737, 742 (1st Cir. 2016)).

Circle does not state that amendment would be futile, *see* Circle Br. 43, and it would not be. Instead, Circle says that Celacare's right to amend was not "preserved" because Celacare supposedly made only a "contingent request for leave to amend" in its opposition to the motion to dismiss. *Id*. But this Court has rejected that argument many times:

> [Defendant] says [Plaintiff] has waived his opportunity to amend by making only a passing reference to a request for leave to amend in his briefs to the district court. That is not our law. This court has treated many similar requests to be sufficient invocations for leave to amend under Rule 15(a). *See, e.g.*, *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183 (1st Cir. 2006); *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 20 (1st Cir. 2004); *Invest Almaz v. Temple–Inland Forest Prods. Corp.*, 243 F.3d 57, 71 (1st Cir. 2001).

*U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 734 (1st Cir. 2007) (case descriptions omitted). Unsurprisingly given this clear law, the cases on which Circle relies for this point do not address the circumstances here: *Fisher v. Kadant, Incorporated*, 589 F.3d 505, 507 (1st Cir. 2009), concerned post-judgment relief, and in *Fire & Police Pension Association of Colorado v. Abiomed, Incorporated*, 778 F.3d 228, 247 (1st Cir. 2015),

there was "no suggestion that amendment would be anything other than futile." *See* Circle Br. 43. The applicable law is pellucid: where, as here, a complaint is dismissed under Rule 12(b)(6) and amendment would not be futile, a district court must dismiss without prejudice or with leave to amend so that the plaintiff has a chance to correct any technical defects. *Ballou v. General Electric Co.*, 393 F.2d 398, 400 (1968) ("[N]ot only should leave to amend be granted but for their guidance in amending, plaintiffs should also be informed of the reason."). The district court's decision not to give Celacare a chance to amend on this point was error, and one this Court should correct.

## CONCLUSION

The district court's judgment should be reversed.


Dated: July 16, 2025

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
400 7th St. NW, Suite 304
Washington, DC 20025
(202) 670-4809
charlie@gerstein-harrow.com

Jason Harrow

GERSTEIN HARROW LLP
12100 Wilshire Blvd. Suite 800
Los Angeles, CA 90025
(323) 744-5293
jason@gerstein-harrow.com

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

Counsel certifies that this brief complies with the word limitation set forth in the Federal Rules of Appellate Procedure because it contains 6,190 words, according to the word-processing system used to prepare this brief, calculating by the word processing system used in its preparation, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Century Schoolbook 14-point font.

*/s/ Charles Gerstein*

*Attorney for Plaintiff–Appellant*

14a